# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA**

v.   **Case No. 18-cr-40006-01-HLT**

**WILLIAM A. JOHNSON**
    *Defendant.*

## MOTION FOR REDUCTION IN SENTENCE OR
## COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)

Mr. William A. Johnson respectfully asks the Court to reduce his sentence from 58 months to time served. The Court has jurisdiction to grant this relief because there has been a lapse of 30 days since Mr. Johnson's request for compassionate release was submitted to the Warden at FCI Lompoc (Low).[1]

According to the U.S. Attorney General, the current public health crisis caused by the COVID-19 pandemic has created "emergency conditions" within the federal prison system.[2] In the context of this pandemic, Mr. Johnson presents the following "extraordinary and compelling"[3] reasons warranting a reduction of his sentence:

1.) Mr. Johnson has already been infected with the SARS-CoV-2 virus, which

---

[1] 18 U.S.C. § 3582(c)(1)(A).

[2] U.S. Atty Gen., Memorandum for Director of Bureau of Prisons (Apr. 3, 2020) (**Exhibit 1**).

[3] 18 U.S.C. § 3582(c)(1)(A)(i); *see also* the Motion addendum filed separately for additional "extraordinary and compelling" reasons that warrant a sentence reduction.

1

causes COVID-19. Although he is listed as "recovered" by the Bureau of Prisons (BOP), his diagnosis, combined with his serious underlying health conditions, make him vulnerable to a potential critical health crisis exacerbated by continued imprisonment;

2.) Mr. Johnson has served almost 30 months of his 58-month sentence (51.7%),[4] and is eligible for release in less than 20 months, with a projected release date next on February 7, 2022;

3.) He suffers from serious underlying health conditions that continue to deteriorate while in custody and that place him at a higher risk of serious illness, complications, or death if he continues to be exposed to and infected with COVID-19, such as: chronic kidney disease, type 2 diabetes, hypertension, Grave's disease (thyroid),[5] and obesity; and

4.) He is imprisoned at FCI Lompoc (Low) in California, which has been the location of one of the worst outbreaks of COVID-19 in the federal prison system. At one point last month, there were 886 reported inmate cases out of the 1162 inmates detained at the facility. Despite the fact that inmates have died at FCI Lompoc within the last month of COVID, the BOP reports that there is only 1 active case as of the date of this filing;[6]

---

[4] This percentage does not take into account good time credits earned. With these credits, Mr. Johnson has served 60% of his sentence.

[5] According to the CDC, there is no current evidence that Grave's disease places a person at higher risk of serious illness if they were to contract COVID-19.

[6] https://www.bop.gov/coronavirus/ (last checked June 23, 2020).

Finally, should the Court determine that a straight reduction in sentence is not warranted, we ask in the alternative that the Court consider granting the reduction to time served, but then add an 18-month term of home confinement as a condition of supervised release, to serve the remainder of his sentence, less good time credit earned.[7]

The government opposes the relief sought in this motion.

## BACKGROUND

Mr. Johnson is one week shy of his 51st birthday. Though he was born in Batesville, Mississippi, he is a California native and resident. He grew up in poverty in the city of Oakland.

Mr. Johnson is married to Crystal Watson-Johnson. They have two children who live at home with their mother in Stockton, California.[8]

### A.  Original Sentence

On November 20, 2018, Mr. Johnson pleaded guilty to conspiracy to possess with intent to distribute a controlled substance, a class A felony.[9] The offense related to four occasions totaling 2970 grams of TCP and 2250.42 grams of PCP.

The Court sentenced Mr. Johnson to 58 months, to be followed by three years of supervised release. In the Judgment, the Court recommended Mr. Johnson be designated to a BOP facility in California to promote family visitation, such as Lompoc

---

[7] USSG § 5F1.2.

[8] Presentence Report (PSR, Doc. 96) at ¶ 77.

[9] 21 U.S.C. § 846, 21 U.S.C. § 841(b)(1)(A)

or Terminal Island.

Mr. Johnson's projected release date from the BOP is February 7, 2022.

**B.     Mr. Johnson suffers from extreme health issues that are deteriorating while he remains incarcerated.**

Mr. Johnson suffers from a myriad of health conditions and overall poor health. Since his case began and he has been imprisoned, he has only gotten worse. Of course, every present discussion about health has to include the risks associated with exposure, continued exposure, and infection with COVID-19.

Mr. Johnson already tested positive to COVID-19.[10] According to the BOP, he is now fully recovered. We hope that is true; we fear it is not. Due to the following health conditions, as exhibited in his BOP medical records,[11] he is already in frail physical condition.

**1.     Chronic Kidney Disease.**

Mr. Johnson suffers from chronic kidney disease, and he considers it his primary health concern. His BOP records indicate his kidney disease is stage 3 and moderate. The last test he had revealed that his kidneys were only functioning at 58%. This test occurred while he was at the prior BOP facility in Beaumont, Texas. He has not been able to be tested yet at FCI Lompoc due to the COVID-19 outbreak. According to the National Kidney Foundation, "People with kidney disease and other severe chronic

---

[10] Westpac Lab report (**Exhibit 2 – SEALED**).

[11] Like the lab report above, because it contains more detailed personal, protected health information, we will ask to file separately and under seal the health summary from his BOP medical records (**Exhibit 3 - SEALED**).

medical conditions are at higher risk for more severe illness" with COVID-19.[12]

### 2. Diabetes

Mr. Johnson suffers from Type 2 Diabetes. He has had diabetic crisis since the inception of this case. In September 2018, while at the CoreCivic Leavenworth Detention Center, he was transported to the emergency department at the KU Medical Center due to a diabetic emergency.[13]

According to the Center for Disease Control (CDC), diabetes puts him at a higher risk for serious illness resulting from a COVID-19 infection.[14] A study of patients in the United States hospitals with diabetes found a "markedly higher mortality than patients without diabetes …."[15] Further, data as of April 2020 from the New York Department of Health showed that diabetes was present in 37% of patients who died from COVID-19.[16]

Because of these increased risks, the American Diabetes Association has written an open letter to all detention facilities, urging relevant parties consider "all possible strategies to release people with diabetes and other serious risk factors related to

---

[12] https://www.kidney.org/coronavirus/kidney-disease-covid-19#does-kidney-disease-put-me-higher-risk

[13] Diabetic Symptoms, CoreCivic LDC medical records (**Exhibit 4 – SEALED**). Although diabetes is mentioned in his PSR (Doc. 96 at ¶ 81), the diabetic emergency information was not included in any detail.

[14] Center for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, (April 17, 2020), at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

[15] Dr. Bruce Bode (Clinical Associate Professor at Emory University School of Health) et al, *Glycemic Characteristics and Clinical Outcomes of COVID-19 Patients Hospitalized in the United States*, at https://glytecsystems.com/wp-content/uploads/Sage.Glycemic-Characteristics-and-Clinical-Outcomes-of-Covid-19-Patients.FINAL_.pdf

[16] *Id.*

COVID-19, and to reduce the level of crowding in detention facilities."[17] That letter explains the combined risk to people with diabetes is a worsened "chance of getting seriously ill from COVID-19 . . . because the body's ability to fight off an infection is compromised."[18]

### 3. Hypertension

Mr. Johnson also suffers from hypertension. Recent data shows that the mortality rate from COVID-19 is 8.4% for those with hypertension, which is far above the mortality rate from the general population with this disease.[19] The CDC has listed hypertension as a factor placing "people at higher risk for severe illness from COVID-19."[20] Further, research shows increased fatality rates for COVID-19 positive persons with hypertension.[21]

### 4. Obesity

By measurement of body mass index (BM), Mr. Johnson is obese. He is not

---

[17] American Diabetes Association, *Open Letter to Detention Centers*, at https://www.diabetes.org/sites/default/files/2020-03/COVID-19%20Letter%20to%20Detention%20Centers.pdf

[18] *Id*.

[19] *See Martinez-Brooks v. Easter & Carvajal*, No. 20-cv-00569-MPS, Doc. 20 at 6 (D. Conn. May 12, 2020).

[20] Center for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, (May 12, 2020), at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html; Ryan Prior, *Those with high blood pressure are at a greater risk for COVID-19. Here's what you need to know to protect yourself*, CNN Health (April 17, 2020), at https://www.cnn.com/2020/04/17/health/blood-pressure-coronavirus-wellness/index.html

[21] American College of Cardiology, *COVID-19 Clinical Guidance For the Cardiovascular Care Team*, ACC Clinical Bulletin (March 6, 2020), at https://www.acc.org/~/media/Non-Clinical/Files-PDFs-Excel-MS-Word-etc/2020/02/S20028-ACC-Clinical-Bulletin-Coronavirus.pdf

6

severely obese, but his BMI exceeds 30.[22] A recent report found that obesity is "one of the most important predictors of severe coronavirus illness."[23] Early studies from New York University Langone Health show that people under 60 "with a BMI of 30-34 were twice as likely to get admitted to the hospital or be admitted to acute care.[24] People under 60 with "a BMI of 35 or higher were twice as likely to be admitted to the hospital and three times as likely to end up in the intensive care unit."[25] Other studies are in line with the Langone study including one from Ochsner Health that showed "60% of patients hospitalized with COVID-19 had obesity and that obesity appeared to nearly double their risk of requiring a ventilator.[26]

### C. Conditions at FCI Lompoc (Low)

Federal Correctional Institution (FCI) Lompoc is "a low security federal correctional institution."[27] As of the date of this filing, FCI Lompoc has 992 people incarcerated in the facility,[28] which is a significant reduction from the prison population

---

[22] https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html

[23] Roni Caryn Robin, *Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients*, New York Times (April 16, 2020), at https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-risk.html

[24] WebMD Health News, *Obesity new risk factor for young COVID patients*, (April 29, 2020), at https://www.webmd.com/lung/news/20200429/obesity-new-risk-factors-for-young-covid-patients; *citing* Dr. Jenifer Lighter, et al, *Obesity in patients younger than 60 years is a risk factor for COVID-19 hospital admission*, Clinical Infectious Diseases (April 9, 2020), at https://doi.org/10.1093/cid/ciaa415

[25] *Id*.

[26] Roni Caryn Robin, *Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients*, New York Times (April 16, 2020), at https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-risk.html

[27] BOP; *FCI Lompoc* (accessed June 23, 2020), at https://www.bop.gov/locations/institutions/lex/

[28] *Id*.

at that facility in the last few months.

Also as of the date of this filing, the BOP website reports that only one inmate and six staff members are currently COVID-19 positive.[29] That is a rate of positivity of .10% of the prison population. These numbers are highly suspect.

When we checked the BOP website about one month ago, it reported that 886 inmates at FCC Lompoc had positive COVID-19 tests and active cases, out of 1162 total inmates at the facility at that time. That is a staggering rate of positivity of 76.2% of the prison population. Thus, according to the BOP, there have been at least 880 recovered inmates at this facility. With such high numbers of cases, FCI Lompoc has been the epicenter of COVID-19 cases in Santa Barbra County, California, accounting for about 47% of confirmed cases.[30]

Mr. Johnson reports that his entire unit was tested in mass together on May 7, which is supported by his BOP records. Almost the entire unit tested positive. Those who tested positive were then all moved to a new location, four to a room, with no social distancing. There was one bathroom, five toilets, five showers, and six sinks for more than 100 people. In his words, "they punished us for being positive." After fourteen days,[31] they were all declared recovered from COVID-19 and then moved back their unit.

---

[29] BOP Website, *COVID-19 Coronavirus; COVID-19 Cases*, (Viewed June 23, 2020), at https://www.bop.gov/coronavirus/index.jsp

[30] http://coronavirusstatistics.org/

[31] Fourteen is the number of days recommended by the CDC for quarantine after being exposed to the virus. Here, the BOP seems to have warped that number into the time it takes a person to recover who has an active case of COVID-19.

8

They were not all recovered. One man, 37 year-old Yusef Mohammed, died in his cell, at his bunk, at FCI Lompoc from COVID-19 after he was declared recovered and then returned to his unit.[32] Mr. Mohammed had reportedly been complaining about chest pains for four days.

## ARGUMENT

### A. The Court has jurisdiction to consider the motion for sentence reduction and grant the requested relief.

The initial inquiry is a jurisdictional one, or whether the Court has the power to consider the motion for a sentence reduction filed by Mr. Johnson. The First Step Act changed the requirement that this type of motion may be filed only by BOP on behalf of a defendant. Now, the Court can consider a sentence reduction, "upon a motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from which the receipt of such a request by the Warden at the defendant's facility, whichever is earlier."[33]

The motion is properly before the Court. Counsel submitted a written request for compassionate release on Mr. Johnson's behalf to Warden Milusnic at FCI Lompoc on May 19, 2020.[34] FCI Lompoc acknowledged receipt of the request on the same day.[35]

---

[32] Minsky, Dave, *Lompoc prison identifies third inmate who died from COVID-19*, Lompoc Record (May 29, 2020), at https://lompocrecord.com/news/local/crime-and-courts/lompoc-prison-identifies-third-inmate-who-died-from-covid-19/article_97cd3eb6-8b88-5f3f-930c-b5a0b7de556d.html

[33] First Step Act § 603(b) (2018), codified at 18 U.S.C. § 3582(c)(1)(A).

[34] Letter to Warden (**Exhibit 5**).

[35] Email Response from FCI Lompoc (**Exhibit 6**).

9

The Warden had previously denied Mr. Johnson's request for compassionate release on May 15, 2020;[36] we did not receive a response to the letter sent by counsel on behalf of Mr. Johnson. Thirty days have now passed since Mr. Johnson made his second request to the Warden. As such, this motion is now properly before this Court.

Recently, there were questions raised in the District of Kansas whether the Court had jurisdiction in a situation, such as here, where the Warden denied a request within 30 days and the defendant did not then pursue and exhaust the administrative process within the BOP to appeal the denial. The weight of the law, including the law within the District of Kansas,[37] is now firmly on the side that the 30-day wait period confers jurisdiction to the District Court, even without exhaustion of the lengthy BOP administrative appeal process.

This Court previously addressed this question when considering a pro se motion[38] and held that a defendant must exhaust through the BOP administrative appeals process. However, the Court in *Vaughn* was considering a pro se motion, a government response that argued administrative appeal was required for exhaustion,

---

[36] Warden Response Letter to Mr. Johnson (**Exhibit 7**). We were not able to produce a copy of the initial request to verify its contents, which is why we submitted a second request on May 19.

[37] *United States v. Jackson*, No. 08-20150-02-JWL, 2020 WL 2812764, at *2 (D. Kan. May 29, 2020) ("The Government has not disputed that defendant's warden received her request at least 30 days before defendant filed her motion. Nor has the Government suggested any reason why the fact of that timing should not satisfy the plain language of the statute. The Court thus concludes that it has jurisdiction to consider defendant's motion."); *United States v. Machuca-Quintana*, No. 12-10085-JTM, 2020 WL 3047596 at *2 (D. Kan. June 8, 2020) ("As provided by statute and recognized by other courts, § 3582(c)(1)(A) permits two alternative avenues of exhaustion: *either* a defendant can exhaust all administrative remedies with the BOP, *or* the defendant can wait for 30 days to elapse from the date from the warden received a request for compassionate release.") (emphasis in original).

[38] *United States v. Vaughn*, No. 18-cr-40107-HLT, Doc. 59 at 2-3 (D. Kan. May 20, 2020).

and without the benefit of adversarial briefing on the issue.

Since *Vaughn*, the government now agrees the Court has jurisdiction here. Thirteen days ago, the government informed the Court in another case that "[t]he 30-day lapse provision is now solidly the official position of the Department of Justice as well as the Bureau of Prisons. In other words, a defendant can file a motion for compassionate release in district court 30 days after requesting relief from the Warden, even if the Warden denies the relief within 30 days."[39]

We are aware of only one circuit court opinion to address the exhaustion requirement. The Sixth Circuit, which held that failure to exhaust administrative remedies does not deprive this court of subject-matter jurisdiction.[40] The Sixth Circuit described the exhaustion requirement as appearing and operating as a "claim-processing rule," rather than a jurisdictional requirement.[41] The plain language of the statute is satisfied once 30 days have passed upon receipt of the request made to the Warden, as this prong of the statute acts as an alternative to the BOP administrative exhaustion prong. The Court has jurisdiction here.

**B. The Court can determine whether "extraordinary or compelling reasons" exist without complete deference to the Bureau of Prisons.**

The Court may grant Mr. Johnson's motion for a reduction of his term of

---

[39] *United States v. Younger*, No. 16-cr-40012-DDC, Doc. 99 at 2, n.2 (D. Kan. June 9, 2020).

[40] *United States v. Alam*, No. 20-1298, 2020 WL 2845694, at *1-2 (6th Cir. June 2, 2020).

[41] *Id.*

imprisonment if "extraordinary and compelling reasons warrant such a reduction."[42] Congress has not provided specifics as to what constitutes "extraordinary and compelling reasons," except, *inter alia*, to state that a reduction must be "consistent with applicable policy statements issued by the Sentencing Commission."[43]

The Sentencing Commission policy statement is found in § 1B1.13. It has not been amended since the passage of the First Step Act. The statement still says the Court may reduce a term of imprisonment "[u]pon a motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A)." Further, Application Note 1 of § 1B1.13 says that a defendant may be entitled to a sentence reduction if, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in connection with, the reasons described in subdivisions (A) through (C)" of the application note.[44]

The Sentencing Commission's policy statement made the BOP the sole gatekeeper to both filing a motion for a reduction in the first instance and to determining whether "extraordinary and compelling reasons" warrant sentence reduction. In other words, the policy statement grants the BOP enormous discretion regarding these motions, commonly referred to as compassionate release motions.

The First Step Act changed the law to shift the discretion to the judiciary and away from the BOP. Since the passage of the First Step Act, in the past year, several

---

[42] 18 U.S.C. § 3582(c)(1)(A)(i).

[43] 18 U.S.C. § 3582(c)(1)(A).

[44] § 1B1.13, n.1(D).

courts have wrestled with the question how to interpret the Sentencing Commission's policy statement now that the First Step Act modified the role of the BOP in the compassionate release process.

Although not an exhaustive catalog of all cases, the overwhelming majority of courts have determined that "the Bureau of Prisons is no longer an obstacle to a court's consideration of whether compassionate release is appropriate."[45] Though, at least one court held that it remains bound to the Sentencing Commission's policy statement regarding the substantive determination as to what are "extraordinary and compelling reasons" despite the passage of the First Step Act.[46]

---

[45] *United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i). An interpretation of the old policy statement as binding on the new compassionate release procedure is likely inconsistent with the Commission's statutory role."); *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *3 (S.D. Tex. June 17, 2019) ("Because the Commission's statutory authority is limited to explaining the appropriate use of sentence-modification provisions under the *current* statute, 28 U.S.C. § 994(a)(2)(C), an amendment to the statute may cause some provisions of a policy statement to no longer fall under that authority ....") (emphasis in original)); *United States v. Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051, at *4 (S.D. Iowa Oct. 8, 2019) ("Therefore, if the FSA is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it."); *United States v. Adams*, No. 6:94-CR-302, 2019 WL 3751745, at *3 (M.D.N.C. Aug. 8, 2019) (holding that the Director of the Bureau of Prisons' prior "interpretation of 'extraordinary and compelling' reasons is informative," but not dispositive.); *United States v. Bucci*, No. CR 04-10194-WGY, 2019 WL 5075964, at *1 (D. Mass. Sept. 16, 2019) ("This Court agrees with Judge Hornby of the District of Maine that interpreting the Sentencing Commission's guidance on compassionate release today begins with the premise that '[t]he First Step Act did not change the statutory criteria for compassionate release, but it did change the procedures, so that the Bureau of Prisons is no longer an obstacle to a court's consideration of whether compassionate release is appropriate.'") (citation omitted).

[46] *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019) ("The Commission may well decide that, since BOP is no longer the gatekeeper regarding the filing of motions for compassionate release, neither should it be the gatekeeper regarding the residual category of extraordinary and compelling reasons for compassionate release. Should the Commission so amend its policy statement, the courts will of course be bound by Section 3582(c)(1)(A) to follow the amended version. Until that day, however, the Court must follow the policy statement as it stands.").

We ask the Court to join the majority view that it is the Court, not the BOP, that decides what are "extraordinary and compelling reasons" that may warrant relief, and whether they are present in this case. Indeed, one District of Kansas Court has already adopted the majority view in *United States v. Perez*.[47]

The Court can assume that when Congress passed § 603(b) of the First Step Act, it did so with full knowledge of how BOP had interpreted and executed the prior version of the statute.[48] Again, Congress was clear by how it titled § 603(b) that Congress's intent was to (as it says) "increas[e] the use and transparency of compassionate release."[49] This language could not be clearer — Congress wants district courts to use compassionate release more.

### C. The "extraordinary and compelling reasons" present here warrant a sentence reduction.

As stated above, the Court can exercise its own discretion as to what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction. The only statutory limitation is that the sentence reduction must be consistent with the application policy statements issued by the Sentencing Commission.[50]

Mr. Johnson requests that the Court consider his age, extreme medical

---

[47] No. 88-10094-1-JTM, Doc. 175 (D. Kan. Mar. 11, 2020) ("As a majority of district courts have concluded, this court concludes that it has the authority to exercise the same discretion as the BOP when weighing a request for compassionate relief.").

[48] *See, e.g.*, *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (noting Congress has "effectively ratified the FDA's long-held position that it lacks jurisdiction under the FDCA to regulate tobacco products").

[49] *Yates v. United States*, 135 S. Ct. 1074, 1090 (2015) (J. Alito, concurring) ("Titles can be useful devices to resolve 'doubt about the meaning of a statute.'") (citation omitted).

[50] 18 U.S.C. § 3582(c)(1)(A).

conditions, and the § 3553(a) factors that led to his sentence. As explained, Mr. Johnson is almost 51 years-old and has multiple, serious health concerns that make him extremely vulnerable to continued imprisonment at a facility ravaged by COVID-19.

He has already been infected with the SARS-CoV-2 virus. He continues to live in a close, communal environment. He has no control over his surroundings. He cannot obtain on his own personal protective equipment and supplies that may protect him against infection.

As of yesterday, 86 federal inmates had died in BOP custody from COVID-19. Courts across the country have factored COVID-19 into their rationales for granting compassionate release.[51] There is no question that, due to his failing health, Mr.

---

[51] *See, e.g., United States v. Hernandez*, No. 18-cr-20474, D.E. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release for defendant with cancer & immunosuppression and just under 12 months left to serve on 39 month sentence); *United States v. Perez*, No. 1:17-cr-513-AT, D.E. 98 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Rodriguez*, No. 2:03-cr-271-AB, D.E. 135 (E.D. Pa. Apr. 1, 2020) (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); *United States v. Gonzalez*, No. 2:18-cr-232-TOR, D.E. 834 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month sentence in light of medical issues; ordinarily these conditions would be manageable but "these are not ordinary times"); *United States v. Marin*, No. 15-cr-252, D.E. 1326 (E.D.N.Y. Mar. 30, 2020) ("[F]or the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."); *United States v. Muniz*, Case No. 4:09-cr-199, D.E. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Bolston*, Case No. 1:18-cr-382-MLB, D.E. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody"); *United States v. Powell*, No. 1:94-cr-316-ESH, D.E. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Campagna*, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (compassionate release grant); *United States v. Copeland*, No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting First Step Act relief to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic"); *United States v. Underwood*, Case No. 8:18-cr-201-

15

Johnson is included in the pool of high-risk inmates susceptible to the disease.[52]

And, although we may not be able to stop him from getting the virus, we are dubious that he has recovered from it. For many, COVID-19 last for months, creating "relentless and rolling waves of symptoms" that impact every aspect of life, and reduce the ability to perform self-care.[53] COVID-19 also can cause long-term health risks for even those who are considered "recovered." Those risks include long-term lung damage, stroke, heart damage, and abnormal blood clotting.[54] This is a new disease and much continues to be unknown about it.

While the studies are concerning, the stories of the people behind those studies make the point even more clearly. We already described the death of Mr. Mohammed, from FCI Lompoc above. Sadly, there are many more stories like his across the BOP – "recovered" inmates who die in prison due to this awful disease.[55]

Additionally, the science has not established that once a person is infected with

---

TDC, D.E. 179 (Mar. 31, 2020) (encouraging release to furlough of elderly defendant in BOP custody because, even though no positive of COVID-19 in his facility, "there is significant potential for it to enter the prison in the near future").

[52] *United States v. Coker*, 2020 WL 1877800 at *4 (E.D. Tenn. 2020) (finding combination of medical conditions including COPD "extraordinary and compelling reasons justifying a sentence reduction.").

[53] Ed Yong, *COVID-19 Can Last for Several Months*, The Atlantic (June 4, 2020), at https://www.theatlantic.com/health/archive/2020/06/covid-19-coronavirus-longterm-symptoms-months/612679/

[54] Lori Parshley, *The Emerging long-term complications of Covid-19, explained*, Vox (May 8, 2020), at https://www.vox.com/2020/5/8/21251899/coronavirus-long-term-effects-symptoms

[55] It is unknown what criteria BOP uses to classify persons as "recovered." For another example, Adrian Solarzano, 54, died at FCI Terminal Island after he was declared "recovered." Wolford, Brooke, *Inmate was another inmate who 'recovered' from coronavirus dies in California prison, officials say*, Sacramento Bee (May 28, 2020), at https://www.sacbee.com/news/coronavirus/article243076476.html.

16

COVID-19, that they are then "immune" from the virus in the future. As a recent article from the Journal of the American Medical Association explains, "existing limited data on antibody responses to SARS-CoV-2 and related coronaviruses, as well as one small animal model study, suggest that recovery from COVID-19 might confer immunity against reinfection, at least temporarily. However, the immune response to COVID-19 is not yet fully understood and definitive data on post-infection immunity are lacking."[56] So if Mr. Johnson is positive and asymptomatic, that does not ensure he isn't at risk of future severe illness.[57]

Further, Mr. Johnson has completed more than half of 58-month sentence. His projected release date is February 7, 2022. Mr. Johnson's age, health concerns, possibility for contracting COVID-19, and over half-completion of his sentence are extraordinary and compelling reasons for a sentence reduction.

### D. A reduction in sentence in consistent with Congressional and Department of Justice intent following the onset of the COVID-19 pandemic.

The second statutory requirement for compassionate release is that the sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission."[58] The applicable policy statement is found in § 1B1.13 of the Sentencing Guidelines. Application Note 1 of § 1B1.13(1), sets forth additional reasons why,

---

[56] Dr. Robert Kirkcaldy (MD, MPH), Dr. Brian King (PhD, MPH), Dr. John Brooks (MD), *COVID-19 and Postinfection Immunity: Limited Evidence, Many Remaining Questions*, JAMA (May 11, 2020); 2020;323(22):2245-2246. doi:10.1001/jama.2020.7869

[57] *See United States v. Raymond Carter*, 16-cr-00156-TSC (D.D.C.).

[58] 18 U.S.C. § 3582(c)(1)(A).

17

according to the Sentencing Commission, compassionate release may be appropriate. It includes in subpart (D) a catchall provision, or "other reasons" for a sentence reduction. As described above, this guideline has not been updated since the passage of the First Step Act, let alone since the onset of the COVID-19 global pandemic.

After the current pandemic began to sweep across the country, the Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).[59] The CARES Act instructed that if the Attorney General found "that emergency conditions will materially affect the functioning of the Bureau [BOP], the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement … ."[60] As detailed above, Attorney General Barr made the findings that "emergency conditions" do in fact currently exist within the BOP.[61] The Attorney General made such findings to protect the health and safety of BOP personnel and persons in BOP custody.[62]

Thus, the mandate from Congress was clear – due to COVID-19, the Executive Branch had the authority to release more people from federal prison, for longer periods of time. The purpose of this law was to reduce the risk of community spread within the

---

[59] PL 116-136, 134 Stat. 281 (Mar. 27, 2020).

[60] *Id.* at § 12003(b)(2).

[61] *Supra* note 2 (Exhibit 1).

[62] DOJ, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic*, Att'y Gen. (Mar. 26, 2020) (Ordering the Director of the Bureau of Prisons to "prioritiz[e] home confinement as appropriate in response to the COVID-19 pandemic . . . to protect the health and safety of BOP personnel and the people in our custody.").

federal prison system, especially to vulnerable inmates, such as Mr. Johnson. This intent was echoed by the Attorney General of the United States.

We do not ask the Court to grant CARES Act relief here, as that decision and authority is left solely to the BOP.[63] Rather, we invite the Court's attention to Congressional intent, and the Direction to the BOP from the Attorney General, as it may inform the Judicial decision we ask this Court to make in exercise of its own authority and discretion.

### E. Release Plan

If released, Mr. Johnson can reside with either his wife and children at their home in Stockton, or with his mother in law in Richmond. Although he prefers to go home, his wife is on federal supervision and thus may not be approved as a valid release plan. We are happy to provide their address and points of contact to US probation, if requested. Additionally, The two addresses: his family assures they will provide for any necessary medical care and treatment.

## CONCLUSION

The Court has the jurisdiction and the discretion to decide whether to grant the motion to reduce Mr. Johnson's sentence. Mr. Johnson's age and extremely poor, if not critical health conditions, the amount of time served thus far, all culminate as extraordinary and compelling reasons for reduction of his sentence to time served. This risk to his health outweighs any benefit to keeping him imprisoned for the remainder

---

[63] 18 U.S.C. § 3624(c)(2).

of his sentence.[64] We respectfully ask the Court to grant this motion.

                                               Respectfully submitted,

                                               s/ Rich Federico
                                               Rich Federico, #22111
                                               Assistant Federal Public Defender
                                               117 SW 6th Avenue, Suite 200
                                               Topeka, Kansas 66603-3840
                                               Phone: 785-232-9828
                                               Fax: 785-232-9886
                                               Email: rich_federico@fd.org

## **CERTIFICATE OF SERVICE**

      I hereby certify that on June 23, 2020, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Jared Maag
Assistant United States Attorney
jared.maag@usdoj.gov

---

[64] *See, e.g.*, *United States v. Brooks*, No. 07-CR-20047-JES-DGB, 2020 WL 2509107, at *6 (C.D. Ill. May 15, 2020) (releasing prisoner who served approximately half of his 30 year sentence; "keeping Defendant imprisoned in an institution unable to quell the plague of COVID-19 within is not consistent with any of the § 3553(a) factors").